**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

INSERRA SUPERMARKETS, INC.

Plaintiff,

vs.

THE STOP & SHOP SUPERMARKET
COMPANY, LLC, ABC CORPORATIONS 1-10
(names being fictitious and unknown but identified
as those companies associated with Stop & Shop that
assisted with and promoted the use of sham petitions
and anti-competitive acts), and JOHN DOES 1-10
(names being fictitious and unknown but described
as those companies associated with Stop & Shop that
assisted with and promoted the use of sham petitions
and anti-competitive acts)

Defendants.

CIVIL ACTION NO.
2:16-cv-01697-WJM-MF

*Document Electronically Filed*

---

# BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

---

Arthur N. Chagaris, Esq.
John J. Lamb, Esq.
Daniel L. Steinhagen, Esq.
Martin R. Kafafian, Esq.
BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645
Telephone: (201) 573 1810
Facsimile: (201) 573 9736

*Attorneys for Plaintiff,*
*Inserra Supermarkets, Inc.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................ 1

ARGUMENT ............................................................................................ 6

I.    THE FAC PLEADS SUFFICIENT FACTS DEMONSTRATING
     MARKET POWER ............................................................................ 7

II.   THE COMPLAINT, FILED LESS THAN FOUR YEARS AFTER
     S&S INSTITUTED SHAM LITIGATION, IS TIMELY
     UNDER 15 U.S.C. 15b ............................................................................

III.  THE *NOERR-PENNINGTON* DOCTRINE DOES NOT
     IMMUNIZE S&S' BASELESS CLAIMS BECAUSE
     THE SHAM EXCEPTION APPLIES ................................................. 16

     A.    S&S Filed a Series of Sham Lawsuits to
          Block Competition .............................................................. 17

     B.    Defendant's Conduct Falls Within the Sham Exception to
          Noerr-Pennington Immunity ................................................. 25

           i.    IS did not need a use variance to redevelop a
               supermarket on a site originally developed with a
               supermarket by S&S ...................................................... 26

           ii.   S&S' conflict of interest claims were objectively
               baseless ........................................................................ 29

           iii.  S&S' witnesses' false testimony highlights S&S'
               motives ........................................................................ 29

           iv.  S&S's arguments about a traffic light had no merit ...... 30

v.      S&S's large truck claims were objectively baseless...... 31

vi.     S&S' arguments that a shopping center is a residential
        zone were specious......................................................... 32

vii.    S&S' other insubstantial participation during the WPB
        hearing........................................................................... 33

viii.   Conclusion ..................................................................... 33

IV.    THE FAC STATES A CLAIM FOR CONCERTED ACTION ........ 34

V.     IS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED
       BECAUSE THIS CASE AND S&S' LAWSUITS ARISE
       FROM DIFFERENT CORE FACTS AND THE
       POLICIES UNDERLYING THE ENTIRE CONTROVERSY
       DOCTRINE MILITATE AGAINST ITS APPLICATION .............. 36

CONCLUSION ............................................................................ 40

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ....................................................................... 10, 11

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ................................................................................. passim

*City of Pittsburgh v. W. Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ....................................................................... 12, 13

*Cont'l Cas. Co. v. Dominick D'Andrea, Inc.,*
    150 F.3d 245 (3d Cir. 1998) .............................................................................21

*DiTrolio v. Antiles,*
    142 N.J. 253 (1995) .................................................................................... 37, 38

*Eastern Railroad v. Noerr Motor Freight,*
    365 U.S. 127 (1961) ................................................................................... 17, 19

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ...............................................................................7

*Garvey v. Township of Wall,*
    303 N.J. Super. 93 (App. Div. 1997).......................................................... 37, 38

*Gordon v. Lewistown Hospital,*
    423 F.3d 184 (3d Cir. 2005) ...............................................................................8

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.,*
    806 F.3d 162 (3d Cir. 2015) ..................................................................... passim

*Hartz Mtn. Ind., Inc. v. Planning Bd. of Ridgefield Park,*
    slip op., 2004 WL 4076338 (App. Div. June 2, 2004) .......................................20

*Hedges v. United States,*
    404 F.3d 744 (3d Cir. 2005) ...............................................................................7

*Hirth v. Hoboken,*
    337 N.J. Super. 147 (App. Div. 2001).................................................................39

iii

*In re Flonase Antitrust Litig.,*
795 F.Supp.2d 300 (E.D. Pa 2011) ....................................................26

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
998 F.2d 1144 (3d. Cir. 1993) ...........................................................15

*In re Relafen Antitrust Litigation,*
286 F.Supp.2d 56 (D. Mass. 2003) ............................................ 14, 15

*In re Terazosin Hydrochloride Antitrust Litig.,*
335 F.Supp.2d 1336 (S.D. Fla. 2004) .................................................14

*Joel v. Morrocco,*
147 N.J. 546 (1997) ...........................................................................37

*Karpovich v. Barbarula,*
150 N.J. 473 (1997) ...........................................................................39

*Kirk v. Raymark Indus., Inc.,*
61 F.3d 147 (3d Cir. 1995) .................................................................30

*K-Land Corp. No. 28 v. Landis Sewerage Authority,*
173 N.J. 59 (2002) .............................................................................38

*Klug v. Bridgewater Planning Bd.,*
407 N.J. Super. 1 (App. Div. 2009) ....................................................29

*LoBiondo v. Schwartz,*
323 N.J. Super. 391 (App. Div. 1999) .................................................15

*Luxpro Corp. v. Apple Inc.,*
2011 WL 1086027 (N.D. Cal. Mar. 24, 2011) .....................................21

*Pace Indus., Inc. v. Three Phoenix Co.,*
813 F.2d 234 (9th Cir. 1987) ....................................................... 15, 16

*Phillips v. County of Allegheny,*
515 F.3d 224 (3d Cir. 2008) ................................................................6

*PRB Enterprises, Inc. v. Planning Bd.,*
105 N.J. 1 (1987) ...............................................................................28

iv

*Professional Real Estate Investors, Inc. v. Columbia Pictures,*
    508 U.S. 49 (1993) ...................................................................... passim

*Puerto Rico Tel. Co. v. San Juan Cable, LLC,*
    2012 WL 4052018 (D.P.R. Sept. 13, 2012) ......................................21

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) .............................................................11

*Reilly v. Brice,*
    109 N.J. 555 (1990) ...........................................................................39

*Selobyt v. Keough-Dwyer Corr. Fac.,*
    375 N.J. Super. 91 (App. Div. 2005)..................................................36

*Shim v. Washington Twp. Planning Bd.,*
    298 N.J. Super. 395 (App. Div. 1997)................................................31

*Tunis Brothers Co., Inc. v. Ford Motor Co.,*
    952 F.2d 715 (3d Cir. 1992) ................................................................8

*United Mine Workers of America v. Pennington,*
    381 U.S. 657 (1965) ............................................................. 17, 25, 34

*Waste Management of Penn., Inc. v. Shinn,*
    938 F.Supp. 1243 (D.N.J. 1996).........................................................37

*Waugh Chapel South, LLC v. United Food and Commercial Workers Union
    Local,*
    27, 728 F.3d 354 (4th Cir. 2013) .......................................... 18, 23, 25

*Willoughby v. Planning Bd.,*
    306 N.J.Super. 266 (App. Div. 1997)..................................................37

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971) ...........................................................................12

## STATUTORY AUTHORITIES

15 U.S.C. 15b............................................................................... i, 1, 12

N.J.S.A. 39:3-84(a)(4).........................................................................31

v

N.J.S.A. 40:27-6.6.................................................................................22

N.J.S.A. 40:55D-22b.............................................................................22

N.J.S.A. 47:1A-6...................................................................................22

## RULES AND REGULATIONS

Fed.R.Civ.P. 12(b)(6)..............................................................................7

Fed.R.Civ.P. 12(d) ................................................................................11

vi

## PRELIMINARY STATEMENT

Inserra Supermarkets, Inc. ("IS") filed the Complaint seeking relief from Defendant Stop & Shop Supermarkets Company, LLC ("S&S") due to its six-year campaign of sham objections to IS' land use development application.  IS sought land use approvals from the Wyckoff Planning Board ("WPB"), the Bergen County Planning Board ("CPB"), and the Bergen County Freeholders ("BCF") to authorize the redevelopment of an existing, vacant supermarket building in Wyckoff, New Jersey.  Ironically, that supermarket was developed 40 years ago by S&S.  Now, S&S now operates a supermarket next door.  S&S delayed IS' land use approvals, and when IS received its approvals in 2013, S&S started a campaign of sham lawsuits by challenging every approval it could to block competition.

The antitrust claims in the First Amended Complaint ("FAC") are meritorious and well-pled.  The Complaint is timely and states a valid cause of action.  S&S' affirmative defenses are improper on a motion to dismiss the Complaint and do not inoculate the bogus claims it made during the administrative process and in the New Jersey courts.  Therefore, S&S' motion should be denied.

## STATEMENT OF FACTS

Beginning in the fall of 2009, IS sought land use approvals from the WPB, CPB, and BCF to redevelop a vacant supermarket site formerly occupied by S&S, for a new Shop-Rite supermarket.  FAC ¶ 65.  S&S, the owner of the only other

1

2639695_15\160089
Case 2:16-cv-01697-WJM-MF   Document 25   Filed 09/30/16   Page 9 of 47 PageID: 1032

supermarket in Wyckoff, vehemently opposed these efforts from the outset.  Its opposition included monitoring the status of IS' application for several months and waiting until only a few hours before the first land use hearing, in July of 2010, to interpose a baseless objection to the jurisdiction of the WPB that a supermarket was prohibited under Wyckoff's zoning ordinance.  FAC ¶ 69, 75, 137.

At some point prior to the commencement of the hearing, S&S conspired with its landlord, Munico Associates, LP ("MA"), to object to the IS application. Declaration of Stephen Hittman at ¶4-5 ("SH Dec."); FAC ¶ 70-73.  MA also had another attorney stealthily taking notes at the WPB hearings and waiting to spring other objections to IS' application.  Declaration of James E. Jaworski, Esq. ("JEJ Dec.) at ¶15.  It was only after IS' counsel called him out during the seventh hearing, that new counsel for MA appeared.  JEJ Dec. ¶15.  Only then did MA& and S&S make other, belated objections, such as to the sufficiency of IS' public notice.  JEJ Dec. ¶15.  This delayed the resolution of the application.

S&S' conduct over the course of the hearing, which lasted nearly three years, delayed, in part, due to S&S's sham arguments, evidenced its intent to delay the approval process as long as possible, in comparison to the hearings on S&S' store on the adjacent lot, which were completed in two hearings held within five days of each other.  For example, S&S argued that a 200,000 square foot shopping center was in a "residential zone" (which would mandate larger setbacks and

buffers and adversely affect the project design), solely because there are a few apartments above a retail building on the site, even though the Zoning Ordinance did not so provide.  Declaration of Daniel L. Steinhagen ("DLS Dec.") at Ex. 1 at p. 26, ¶12.  It claimed that IS' proposed building was too close to those apartments, even though the new proposed building was further away than the existing building on the property, and S&S' own building and a huge parking lot was between the IS' store and the residential units.  JEJ Dec. Ex. 19.  S&S also presented false and misleading testimony to the WPB to prolong the hearing process.  DLS Dec., Ex. M-6; M-7.  Sometimes the WPB identified the obfuscations; other times, IS had to call witnesses to discount them.  But S&S never explained its false claims.

S&S' and MA's approach to blocking competition is best exemplified by how they alleged the WPB's traffic consultant had a conflict of interest.  JEJ Dec. ¶21. But the way they did it was deplorable – S&S' and MA's attorneys coordinated before the hearing about how to interpose the objection to cause maximum delay.  DLS Dec., Ex. M-9 at 99-14 to 99-24.  First, S&S presented a written exhibit related to the WPB's traffic expert, and only after the document was in the record, was the objection, pointing to the earlier taint, made.  DLS Dec., Ex. M-9 at 18-18 to 20-23.  When the WPB realized what S&S had done, it was livid.  DLS Dec., Ex. M-9 at 96-10 to 96-17.  But rather than accede to S&S' demands to re-start the hearing from the beginning, the WPB correctly decided,

3

because the traffic expert had not yet testified, that he could be replaced with a new one, who would be free from any possibility of taint.   DLS Dec., Ex. M-10 at 28-20 to 35-10; GVA Dec. at Ex. H at p. 41-42.

S&S argued that the traffic at a nearby intersection was already so heavy that IS' project should not open before a traffic light was actually installed at IS' expense.   DLS Dec., Ex. A at p. 30.   But S&S' proposed signal was at a location where the WPB had no authority.   GVA Dec. at Ex. H, p. 41.   Over S&S' objections, the WPB deferred the issue to the CPB, but required that if a light was required, IS pay its *pro-rata* share for it.   GVA Dec. at Ex. H, p. 65-66.

In sham lawsuits commenced on April 1, 2013, S&S and MA continued to assert the baseless claims raised during the WPB hearings.   DLS Dec., Ex. A; B. They also raised, in violation of the rules governing prerogative writ proceedings, brand new arguments that IS was forced to defend, even though the new arguments were not previously presented to the WPB, without a full record.   DLS Dec., Ex. BB; JEJ Dec. ¶29-32.   S&S' arguments on appeal disregarded the testimony and evidence presented to the WPB, and were unsupportable by the record.   IS successfully obtained summary judgment, dismissing the claim that a use variance was required and affirming the decision there was no conflict of interest.   DLS Dec., Ex. E, F.   Before the Law Division, the state trial judge affirmed the WPB's decision and rejected <u>every</u> count of S&S' complaint.   DLS Dec., Ex. G.   Then, on

4

appeal, the state appellate court affirmed the Law Division decision and concluded

that most issues S&S raised on appeal lacked enough merit to even warrant

discussion in the opinion.  DLS Dec., Ex. H.

      S&S' tactics before the CPB replicated its conduct before the WPB.

Although it had monitored IS' application to the CPB since 2010, it wrote to the

CBP on the day before the hearing in April of 2014 and requested an adjournment.

GVA Dec. at Ex. JJ.  There too, S&S pressed its claim that an off-tract traffic light

was needed before IS could open, but the CPB conditioned approval upon IS

paying its *pro-rata* share for such a light, if and when a light was required, and

estimated those costs at $175,000.  DLS Dec., Ex. JJ at p. 12.  When S&S sought

*de novo* review from the BCF, it improperly introduced a huge stack of new

documents at the hearing, which included a report from S&S' traffic expert who

had not testified before the CPB.  DLS Dec., Ex. II at p. 23-10 to 25-22.  This

appeal became another new challenge with new documents and issues.  Rather than

help S&S' position regarding the light, the report estimated that IS' *pro-rata* share

of the off-tract traffic light would be approximately $169,835.  DLS Dec., Ex. HH

at p. 6.  Yet S&S continued to complain about the timing of when the light would

be installed and how the costs were to be calculated.  Then S&S challenged the

CPB's and BCF's decisions in court, and again raised new issues not presented to

the administrative agency.   DLS Dec., Ex. D at p. 21-25.   Again, its complaint was wholly rejected.  DLS Dec., Ex. I, J, K.

S&S next sued Bergen County on August 18, 2014 on the theory that the County had improperly withheld three documents regarding IS' application in 2011.  DLS Dec., Ex. C.  But rather than seeking to compel production of the documents, which it obtained after a second records request years later with a different description of the documents requested, S&S sought declaratory relief not available under New Jersey's Open Public Records Act that its rights in the hearings on IS' application had been violated.  That lawsuit was also summarily dismissed by the state trial court because it was time barred and the relief S&S sought was simply improper.  DLS Dec., Ex. L.  S&S acted to block competition, not to redress legitimate grievances.  FAC ¶ 3.  Its objections and suits were a sham and it is not immune from suit.

## ARGUMENT

In deciding a motion to dismiss, the court must assume that all of the factual allegations in the complaint are true, and it must draw all reasonable inferences from the pleaded factual allegations in favor of the non-moving party. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' to give the defendant fair notice of what the . . . claim is

6

and the grounds on which it rests.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When a defendant moves to dismiss for failure to state a claim, that "defendant bears the burden of showing that no claim has been presented*.*"  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Courts conduct a three-pronged analysis when deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6).  *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'"  *Id.* at 563.  Second, the court must accept all of the plaintiff's well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Only legal conclusions, or wholly unsupported conclusory factual allegations need not be accepted as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Third, the court must determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211.

## I.    THE FAC PLEADS SUFFICIENT FACTS DEMONSTRATING MARKET POWER

S&S disregards Third Circuit precedent and our liberal pleading standards, to argue that IS insufficiently pleaded and inadequately identified the relevant geographic market and market power. S&S's arguments fail.

7

Preliminarily, the geographic scope of the relevant market is generally not an issue that can be adjudicated on the pleadings, but a question of fact determined in each case in acknowledgement of the commercial realities of the industry being considered. *Gordon v. Lewistown Hospital*, 423 F.3d 184, 212 (3d Cir. 2005).  The geographic market is the area in which a potential customer would rationally look for the goods or services he seeks, not where the seller attempts to sell.  *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1992).

IS' antitrust claims mirror those decided in *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, (3d Cir. 2015). Like here, *Hanover* involved sham litigation initiated to delay the approval process and to harm competition. The plaintiffs in *Hanover* described the geographic market at issue there as "the greater Morristown area.[1]" Here, IS describes the geographic market as "the Township of Wyckoff and/or the immediately surrounding Greater Wyckoff area . . .", "the Greater Wyckoff Area, and in particular Wyckoff," and "Wyckoff and the Greater Wyckoff Area" (hereinafter "Greater Wyckoff Area"). FAC ¶¶ 2, 243, 250, and 251.

S&S's argument echoes that of the defendant in *Hanover,* where the Third Circuit summarized the argument thusly: "that the proposed geographic market— greater Morristown—is too imprecise. In Defendants' view, Hanover Realty has

---

[1] FAC ¶ 183, 185, 186

not alleged facts suggesting that ShopRite could raise prices without causing

consumers to drive elsewhere." 806 F. 3d at 183; emphasis supplied.  However,

and as this court should do, the Third Circuit squarely and unambiguously rejected

this argument. The Third Circuit held

> Hanover Realty alleges that, when it comes to buying groceries,
> consumers like to shop near their homes. Thus, it alleges, proximity to a
> large upscale population is an important factor in determining where to
> locate a full-service supermarket. We find it plausible that greater
> Morristown, which includes Morristown and its neighboring
> communities, is a distinct geographic market. If the ShopRite in
> Morristown raised its prices, it is plausible that only the most diligent and
> frugal customer would move his or her grocery shopping to a more
> distant supermarket.  [*Id.* at 183-184; emphasis supplied]

Just like the plaintiff in *Hanover,* IS also pled that proximity to the store is

the key to factor to defining the relevant market because

> "[c]onsumers overwhelmingly prefer to purchase their food from local
> vendors located near their homes.  For this reason, markets for
> supermarket services tend to be geographically smaller and localized.
> This is particularly true in the full-service supermarket market, where
> convenience is valued and demanded by customers." [FAC ¶ 55]

If describing the geographic market as "the greater Morristown area" was enough

for the Third Circuit, then a description for the geographic market as "the Greater

Wyckoff Area," should be more than enough for this Court.

We next address S&S's claims that the FAC's allegation of market power in

the Greater Wyckoff Area is "implausible" because other supermarkets, which

were not identified in the FAC, are "within the area in which a potential buyer may

9

rationally look for goods or services he or she seeks." (Motion to Dismiss at 34-35.).  Again, and in *Hanover,* the Third Circuit sunk the very same argument.

S&S's argument is flawed because it asks this Court to recognize, rely, and make rulings upon facts not included in the FAC. In *Hanover*, the defendant made a similar argument, claiming: "there is no dangerous probability of achieving a monopoly because there is another full-service supermarket in the area—the Stop & Shop of Morris Plains." 806 F.3d at 184, n. 17.  *Hanover* rejected this argument because "[i]n the amended complaint, Hanover Realty alleges that the Stop & Shop is a 'grocery store' and that ShopRite is the 'only full-service supermarket" in Greater Morristown.' We must accept those allegations as true." *Id.*

Even if the Court credited S&S's claims that the other supermarkets are actual competitors with the S&S full service supermarket, then that would still be far from dispositive. In deciding whether there is a dangerous probability of achieving monopoly power, courts consider the strength of competition, the probable development in the industry, the barriers to entry into the market, the nature of the anti-competitive conduct, and the elasticity of consumer demand. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007).  No single factor is dispositive.  *Id.*  A defendant's market share is *a* consideration but market shares as low as 44% have supported an attempted monopolization claim, when there were additional market factors, such as high barriers to entry and inability to

expand production. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Determining whether there is a dangerous probability that the defendant obtains monopoly power is "a particularly fact-intensive inquiry." *Broadcom*, 501 F.3d at 318. This dooms S&S's motion from the very start.

The particularity and intensiveness of the fact inquiry necessary here is highlighted by the Declaration of economist John Bigelow, Ph.D. ("JPB Dec."). Dr. Bigelow sets forth some of the "fact intensive inquiry" that must be completed to analyze S&S' market power. JPB Dec. at ¶28. Mr. Bigelow rightly opines that "the relevant geographic market alleged by the plaintiff is consistent with the relevant markets alleged by the Federal Trade Commission in cases challenging supermarket mergers, and preliminary indications are that the relevant market alleged by the plaintiff is sufficiently concentrated to raise antitrust concerns." JPB Dec. at ¶ 9a. Even if the Court credited S&S's assertions about competitors and converts the instant motion into one for summary judgment under Fed.R.Civ.P. 12(d), judgment is still not warranted due to contested issues of material fact.

The final straw of S&S's argument against the FAC's allegation of market power is that IS has failed to sufficiently plead barriers to entry because a cognizable barrier to entry for antitrust analysis "is a cost that a new entrant must incur that was not incurred by the incumbent." (Motion to Dismiss at 35.) According to S&S, the entry barriers identified by IS were all incurred by S&S

11

itself.  The fundamental flaw in this argument is that it ignores paragraph 12 of the

FAC, which alleges that S&S' "series of sham petitions and objections" has

"heighten[ed] the barriers to entry in this market and thereby harm[ed] competition

in the market as a whole." In other words, the entry barrier that IS faces, which was

not faced by incumbent S&S, is S&S's own actions when it engaged in its "series

of sham petitions and objections."  The FAC alleges, in paragraph 64, that S&S got

its unchallenged approval after two hearings held within five days of each other; it

took IS thirty nine hearings, and then S&S started sham lawsuits. *Hanover* ruled

that this type of conduct is unlawful and may support a monopolization claim.  The

motion for failure to state a claim should be denied.

## II.    THE COMPLAINT, FILED LESS THAN FOUR YEARS AFTER S&S INSTITUTED SHAM LITIGATION, IS TIMELY UNDER 15 U.S.C. 15b

The four-year statute of limitations under 15 U.S.C. 15b "accrues and the

statute begins to run when a defendant commits an act that injures a plaintiff's

business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338

(1971).  There are two exceptions: when damages are speculative and if there is a

continuing violation.  *Id.* at 338-39.  Each applies here.

First, even though defendants petitioning activities commenced in 2010, this

action could not have been brought until the WPB approved IS' site plan

application.  *See City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256 (3d Cir.

1998).  The resolution approving IS' application was issued on February 13, 2013 and this action was filed less than four years later, on March 28, 2016.  GVA Dec. at Ex. H.  Had IS filed before approval or if the WPB denied the application, its damages would have been speculative (or non-existent).

In *City of Pittsburgh*, Pittsburgh negotiated with Allegheny to provide energy to a part of the city serviced by another provider and sought approval from the Pittsburgh Utility Commission.  *Id. at* 260.  While that petition was pending, Allegheny and the other provider merged and the application was withdrawn.  *Id.* at 262.  Pittsburgh alleged the merger caused an antitrust injury.  *Id.*

In affirming the dismissal of the City's complaint, the Third Circuit explained that Pittsburgh could suffer no antitrust injury because the PUC had not yet approved the utility's application and the "question of whether PUC would amend Allegheny Power's certificate and permit it to provide electric services . . . would remain unresolved."  *Id.* at 267-26.   The court explained

> "[t]he presence of the regulatory scheme and need for approval in connection with the choice of utilities to serve the Redevelopment Zones cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise."  *Id.*

Accordingly, "[t]he injury . . . [was] simply too speculative to permit relief. . ."  *Id.*

Without approval from the WPB, CPB and BCF, IS could not commence construction and enter the market.  This is why courts carved out the "speculative

13

damages exception" which tolls the application of the statute of limitations until the necessary regulatory approvals are granted. *See, e.g., In re Relafen Antitrust Litigation*, 286 F.Supp.2d 56 (D. Mass. 2003).

S&S' reliance on *In re Relafen* is misplaced. *Reflagen* found that the speculative damages exception applied to toll plaintiffs' accrual date from filing of the allegedly sham ANDA litigation to the date the first tentative approval was received by a generic competitor. *Id.* at 63–64. The court reasoned that prior to receiving approval, damages are "entirely speculative" since it was unclear "whether the FDA itself would even approve competitors" in the first instance. *Id.* at 63; *see also In re Terazosin Hydrochloride Antitrust Litig.,* 335 F.Supp.2d 1336, 1368 (S.D. Fla. 2004). *Relafen* also noted the "absurd result" that would occur without the exception. If accrual occurred before approval, "vast numbers of potential antitrust plaintiffs would be required in every patent or business litigation to sue or intervene preemptively in those actions in the unlikely (but possible) event that the suit was filed fraudulently." 286 F.Supp.2d at 64.

To accept S&S' argument requires the applicant in any land use case contested by a competitor to sue immediately, and sometimes before receiving approval. "Such a policy inevitably would lead to a glut of superfluous litigation and would effectively cripple many underlying suits [or objections] with the burden of accommodating legions of potential antitrust plaintiffs." *Id.* at 64. A

14

policy of encouraging suit at the first sign of an objection could discourage meritorious objections despite New Jersey's strong interest in preventing that outcome. *See, LoBiondo v. Schwartz*, 323 N.J. Super. 391 (App. Div. 1999).

Second, S&S filed numerous sham petitions as part of a continuing scheme. It objected before different regulatory bodies, under different jurisdictions. Then, it filed three separate legal actions in court and coordinated with MA to file a fourth. Each of the objections and lawsuits constitutes a separate overt act that inflicts new and accumulating injuries on IS. *Cf., In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144 (3d. Cir. 1993)(although injury-causing actions began in 1950s and plaintiffs knew of them in the 1970s, suit in 1982 was not barred because the injuries continued within the limitations period).

S&S' attempt to bundle separate petitions and lawsuits as "one continuous litigation" has no support in law or reason. This case is dramatically different than those relied on by S&S, which involved the prosecution of one sham lawsuit alleging a particular violation. *See Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir. 1987)(" where the alleged antitrust violation is . . . [the use of the] judicial process, the initiation of judicial proceedings is the last overt act for purposes of the statute of limitations"); *In re Relafen*, *supra,* 286 F.Supp.2d at 61. S&S' citation to footnote 4 in Judge Greenberg's dissent in *Hanover* is inapposite

15

because the defendant argued in that case that the antitrust action was unripe because the legal challenges to the approvals were still pending.

Unlike *Pace* and *Reflagen*, IS filed the FAC within four years of every sham lawsuit S&S started to block IS' competing supermarket. In *Pace*, the court explained that "two elements characterize an overt act which will restart the statute of limitations: (1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff."  813 F.3d at 238.  This is exactly what transpired here.  S&S so delayed the WPB proceedings that they started (but did not conclude) more than four years ago, but its lawsuits are much more recent and remain ongoing.  They represent continuing harassment and the FAC is not time-barred.

By claiming the FAC is time barred, S&S seeks to reward itself for the exceptional delay it wrought in the proceedings before the WPB.  IS sued even within four years of that decision, but because S&S (and MA, at S&S' demand) so thoroughly delayed that process, the WPB hearings took nearly three years.  It was only then that S&S launched its initial salvo of sham litigation.  IS' FAC, based upon sham litigation that commenced less than four years ago, is timely.

## III.   THE *NOERR-PENNINGTON* DOCTRINE DOES NOT IMMUNIZE S&S' BASELESS CLAIMS BECAUSE THE SHAM EXCEPTION APPLIES

IS agrees that the First Amendment generally immunizes legitimate and meritorious political speech, including before administrative agencies and in litigation, that has an anticompetitive effect from antitrust liability. *See, e.g., Eastern Railroad v. Noerr Motor Freight*, 365 *U.S.* 127 (1961); *United Mine Workers of America v. Pennington*, 381 *U.S.* 657 (1965); *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 *U.S.* 508 (1972).  But this is not such a case. The *Noerr-Pennington* doctrine does not sanction the illegitimate use of administrative or judicial process as an anti-competitive weapon, and there is no immunity for sham petitions. *Noerr,* 365 *U.S.* at 144; *Cal Motor,* 404 *U.S.* at 52;

Here, S&S used administrative proceedings before the WPB, CPB and the BCF, and subsequent legal challenges to the decisions of those agencies, as a tool to harm IS and delay IS' entry into the market and to further its monopoly power. FAC ¶ 3.  S&S conspired with MA to delay the approval process and increase IS' costs.  FAC ¶ 71.  But while its efforts to block IS' project have been time-consuming, they were substantively unsuccessful.  While IS has won every battle of the war, it has yet to put a shovel in the ground due to S&S delaying tactics. The conduct alleged in the FAC, just like in *Hanover, supra,* falls squarely within the sham exception and the Court should deny Defendant's motion to dismiss.

### A. S&S Filed a Series of Sham Lawsuits to Block Competition

The Supreme Court explored the sham exception to antitrust liability in the litigation context in *Professional Real Estate Investors, Inc. v. Columbia Pictures*, 508 U.S. 49 (1993) ("PRE").  Previously, the Court had noted that:

> One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused.  That may be a difficult line to discern and draw.   *Cal. Motor, supra,* 404 U.S. at 513.

In *PRE*, the Court was asked to fashion a test to discern when the litigation became a sham by focusing on the motives of the antitrust defendant.  508 U.S. at 56.  In declining that request, the Court concluded that for a lawsuit to be a sham, it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Id.* at 60.

Once the suit is deemed objectively baseless, the subjective motivation of the antitrust defendant should be examined; if the baseless lawsuit conceals an attempt to interfere with the business relationships of a competitor through the use of the process rather than the outcome as an anticompetitive weapon, it is a sham and not immune from liability.  *Id.* at 60-61 (citations omitted).  Concurring with the judgment, Justice Stevens expressed concern about this two part test and questioned its use where more than one lawsuit had been filed.  *Id.* at 69-75.

To resolve the tension identified by Justice Stevens, the Courts of Appeals have sought to harmonize *PRE* with *Cal Motors.  See, e.g., Waugh Chapel South,*

18

*LLC v. United Food and Commercial Workers Union Local 27,* 728 F.3d 354, 363-

364 (4th Cir. 2013).  Most recently, the Third Circuit Court of Appeals held:

> [T]he ultimate purpose of this inquiry is to determine whether the
> petitioning activity is a "mere sham to cover what is actually nothing
> more than an attempt to interfere directly with the business relationships
> of a competitor."  The best way to make that determination depends on
> whether there is a <u>single filing</u> or <u>a series of filings</u>. Where there is only
> one alleged sham petition, *PRE*'s exacting two-step test properly places a
> heavy thumb on the scale in favor of the defendant. With only <u>one "data
> point,"</u> it is difficult to determine with any precision whether the petition
> was anticompetitive. . . . In contrast, a <u>more flexible standard is
> appropriate when dealing with a pattern of petitioning.</u> Not only do
> pattern cases often involve more complex fact sets and a greater risk of
> antitrust harm, but the <u>reviewing court sits in a much better position to
> assess whether a defendant has misused the governmental process to
> curtail competition. As a result, even if a small number of the petitions
> turn out to have some objective merit, that should not automatically
> immunize defendants from liability.</u>
>
> Accordingly, <u>when a party alleges a series of legal proceedings, the sham
> litigation standard from *California Motor* should govern</u>. This inquiry
> asks whether a series of petitions were filed with or without regard to
> merit and for the purpose of using the governmental process (as opposed
> to the outcome of that process) to harm a market rival and restrain trade.
> In deciding whether there was such a policy of filing petitions with or
> without regard to merit, a court should perform <u>a holistic review that may
> include looking at the defendant's filing success—i.e., win-loss
> percentage—as circumstantial evidence of the defendant's subjective
> motivations.</u> . . .<u>A high percentage of meritless or objectively baseless
> proceedings, on the other hand, will tend to support a finding that the
> filings were not brought to redress any actual grievances.</u>  [*Hanover,
> supra,* 806 F.3d at 180-181; emphasis supplied]

In *Hanover*, the competitor challenged three permits and objected to a fourth.  *Id.*

at 167-170.  The Third Circuit held those <u>four</u> events constituted a "series."

19

Here, S&S filed or instigated the filing of four separate lawsuits too, and petitioned numerous approving agencies.  DLS Dec., Ex. A, B, C, D.  But unlike in *Hanover*, where the antitrust defendant challenged the local approval without appearing at the hearing, *id.* at 169, S&S and MA used delaying tactics to stall the WPB hearing for nearly three years to oppose a smaller building than what now exists and where virtually all of the existing zoning non-conformities were being reduced or eliminated.  FAC ¶ 66-67.  But when they each filed their complaints, they each raised new issues on appeal not part of the WPB proceedings.  JEJ Dec. ¶ 29-32.  To be clear, while some of their claims were the same, others were different and new, so much of the appeals were not an outgrowth of the initial petitioning activity.  FAC ¶ 132, 147, The same is true about S&S' objection at the CPB, its *de novo*[2] appeal to the BCF, and its suit challenging the separate decisions of the CPB and BCF.  FAC ¶ 119.  That S&S agglomerated appeals of two separate agencies into a single complaint does not change the fact that it appealed two separate decisions.  S&S challenged every single action it could by making baseless accusations at every turn.  This is its business strategy.  FAC ¶ 217-222.  S&S' efforts far exceed those in *Hanover* (where the defendant had some, limited success in modifying the approvals, which the Third Circuit held immaterial).

---

[2] *See Hartz Mtn. Ind., Inc. v. Planning Bd. of Ridgefield Park, slip op.*, 2004 WL 4076338 (App. Div. June 2, 2004)

While there were four separate lawsuits filed, this case involves more than pursuing ordinary litigation through the appellate process.  S&S' citation to *Luxpro Corp. v. Apple Inc.*, 2011 WL 1086027, at *5 (N.D. Cal. Mar. 24, 2011), and *Puerto Rico Tel. Co. v. San Juan Cable, LLC*, 2012 WL 4052018, at *3 (D.P.R. Sept. 13, 2012), are inapposite.  Here, when S&S and MA filed their separate suits challenging the approval, they raised a plethora of new issues not addressed during the WPB proceedings.  JEJ Dec. ¶ 29-32.  The appeals referenced in *Luxpro* and *Puerto Rico Tel.* were likely subject to the general rule that issues raised for the first time on appeal do not receive attention from an appellate court.  *See Cont'l Cas. Co. v. Dominick D'Andrea, Inc.,* 150 F.3d 245, 251 (3d Cir. 1998).  Here, the FAC alleges that the objections of  S&S (#1) and MA (#2) each individually lodged before the WPB were distinct from those in S&S' (#3)  and MA's (#4) sham lawsuits challenging the WPB decision, and that  S&S' baseless objection before the CPB (#5) differed from its request that the BCF decide IS' application *de novo* (#6) and its subsequent lawsuit (#7).  FAC ¶ 119, 132, 147, 183.  Thus, while these petitions involve three complaints, there were really seven separate data points, plus the OPRA lawsuit (#8), for a total of eight sham petitions.  Because they each involved different claims and documents, the Court should consider them separately.

21

S&S' efforts to minimize its petitioning activity – to try to fall within the *PRE* two-part test rather than the holistic review required by *Cal. Motors* and *Hanover* – is unavailing.  First, its lawsuit challenging the CPB's decision did not flow out of the WPB's approval.  IS required CPB approval because the property to be developed is located on a County Road, which involves different issues that the Township reviewed.  *N.J.S.A.* 40:27-6.6.  DLS Dec., Ex. M-12 at 25-18 to 26-5.  These two separate legal challenges are two separate petitions with different issues, just as in *Hanover, supra,* where the NJDEP wetlands and flood hazard did not similarly flow out of the local approval either.  806 F.3d at 168-169; *see N.J.S.A.* 40:55D-22b (other agency approval required).

Second, S&S' OPRA Complaint was a petitioning event designed to collaterally interfere with IS' approval from the CPB.  Under OPRA, the sole remedy for a violation is an order compelling the production of government records and attorneys' fees.  *N.J.S.A.* 47:1A-6.  When S&S filed its OPRA Complaint, it already had the three documents it sought.  DLS Dec., Ex. L at p. 14.  Instead of seeking the relief afforded by the statute, S&S sought a declaration that its rights before the CPB during the proceedings on IS' application had been violated, presumably to use a judgment in that action to further interfere with IS' efforts.  DLS Dec., Ex. L at p. 11.  That IS was not a party to the OPRA Complaint is immaterial to the Court's analysis of the sham exception.  *See, e.g., Total Renal*

*Care, Inc. v. Western Nephrology and Metabolic Bone Disease, P.C., slip. op.,* 2009 WL 2596483, * 12 (D. Colo. Aug. 21, 2009)("'Sham' litigation need not always involve the targeted competitor as a named party.  Rather, the question is whether the suits were brought 'for the purpose of injuring a market rival'").

Third, the FAC alleges that S&S caused and was the driving force behind MA's challenge to IS' development.  FAC ¶ 70-73.  Initially, MA and S&S were represented by the same counsel, and entered a joint appearance before the WPB.  JEJ Dec. Ex. 11, 14.  But then MA separated itself from S&S and interposed additional objections and causing delay, after its separate attorney, who was lying in wait for several months in the audience of the WPB hearings, was called out during a hearing by counsel for IS.  JEJ Dec. ¶15.  DLS Dec., Ex. M-2 at 98-24 to 99-8; M-3 at 9-23 to 27-19.  MA filed its own challenge to the WPB's decision and raised different claims in the challenge to the approval.  DLS Dec., Ex. B.  The Fourth Circuit's decision in *Waugh Chapel, supra,* was founded upon baseless claims made by surrogates.  728 F.3d at 357-358.  Here, the FAC alleges that MA was essentially S&S' surrogate, and filed a legal challenge to the WPB's decision at the urging of S&S.  FAC ¶ 143-144.  IS was then forced to defend that claim that raised those separate issues too.  That petition should also be counted in the Court's analysis of whether there was a pattern of baseless claims.

23

Four separate petitions, by themselves, constitute a series under *Hanover*. When coupled with the proceedings before several administrative agencies and the new and distinct arguments raised on appeal, there are enough "data points" to support a reasonable inference that S&S misused the legal and administrative process to curtail competition under the holdings of *Cal. Motors*.

S&S' formulation that *Cal. Motors* required proof that "the machinery of the agencies and courts [were] effectively closed . . .", 404 U.S. at 511, is wrong. The passage of *Cal. Motors* quoted on page 31 of S&S' brief refers to the allegations in the complaint in that case. *Id.  Hanover, supra*, imposed no requirement that a developer be unable to start construction on account of sham litigation.

To be sure, Inserra *could* have started construction as S&S claims, since there was no stay sought or obtained. But S&S' citation to *Pond Run Watershed Assn. v. Bd. of Adj.*, 397 N.J. Super. 335, 365 (App. Div. 2008), as proof that IS was not impaired by S&S' sham litigation is misplaced. Rushing to start construction provides no assurances that a development will be allowed to stand when the developer knows of a potential impediment to the development. *Donadio v. Cunningham*, 58 N.J. 309, 321-322 (1971). As *Pond Run* itself noted, a developer who starts construction does so at his own risk and may be required to restore the site. 397 N.J. Super. 365. Putting aside being able to get financing, asking Inserra to invest millions of dollars to knock down the existing store and

24

start building a new one while S&S challenged every aspect of every permit is ludicrous.  S&S' sham objections were designed to stop IS' competing store in its tracks.  They did.

 B. *Defendant's Conduct Falls Within the Sham Exception to Noerr-Pennington Immunity*

On every issue of substance—at every level of the proceedings—S&S' positions have been rejected.  Its batting average is zero.  There were no "partial successes" dotting its record like there were in *Hanover*, *supra,* 806 F.3d at 182. The WPB approved IS' municipal site plan application.  GVA Dec. at Ex. H.  The CPB approved the application.  DLS Dec., Ex. JJ.  The BCF approved IS' county application.  DLS Dec., Ex. KK.  The trial court rejected every claim in the complaints S&S and MA filed in opposition to the WPB approval.  DLS Dec., Ex. E, F, G.  That decision was affirmed on appeal.  DLS Dec., Ex. H.  The trial court also rejected S&S' challenge to the CPB's approval, the BCF's *de novo* approval of the county site plan application.  DLS Dec., Ex. I, J, K.  It separately rejected S&S' OPRA Complaint.  DLS Dec., Ex. L.  Also, as described in the JEJ Dec. and set forth below, S&S' positions were objectively baseless.  No matter whether the Court used the *PRE* or *Cal. Motors* analysis, the claims were baseless.

S&S disregards the standard of review in this Rule 12(b)(6) motion.  Its claims that its sham litigations were not shams are couched in terms that are most

favorable to S&S, not IS as required.  The FAC explicitly alleges not only that

S&S engaged in sham litigation, but also how it did so.  Whether S&S engaged in

sham litigation "is generally a question of fact for the jury[.]" *In re Flonase*

*Antitrust Litig.,* 795 F.Supp.2d 300, 311 (E.D. Pa 2011).  Unless this motion is

treated as a motion for summary judgment, S&S cannot advance an argument that

the allegations in the FAC fail to support an inference that it engaged in sham

litigation because they clearly do.

> i.   IS did not need a use variance to redevelop a supermarket on a
>      site originally developed with a supermarket by S&S

S&S' claim that IS' proposed competing store required a use variance was

rejected at every turn, in a zone where "retail food stores" were a permitted use,

and where S&S operated, on the very site, its food store and then assigned the lease

to A&P, who also operated there, for decades.  The WPB disagreed when S&S

initially objected to its jurisdiction.  The record developed at the administrative

agency yielded only one possible outcome – that S&S' position was clearly wrong.

When this issue was examined by the trial judge, he concluded, in granting

summary judgment to IS and dismissing S&S' claims, "Certainly, a supermarket

no one can argue is a retail food store and then we have another reference to

supermarket, which is defined, but it doesn't – it doesn't mean that in a zone with a

permitted use of a retail food store, a supermarket isn't a horse by another name.

26

It's a retail food store."  DLS Dec., Ex. E at 6-17 to 6-22.   The Appellate Division rejected S&S' argument too: "In the plain and common usage of the term, a supermarket is <u>clearly</u> a retail food store. . .<u>Clearly</u> had the governing body intended to exclude supermarkets from the general 'retail food stores' permitted in the B-5 Business Zone, it knew how to do so."  DLS Dec., Ex. H at p. 8.  The state courts' clarity in resolving highlights the lack of merit in the underlying claim.

S&S' claim that IS required a use variance was based upon an unreasonable and hyper-technical reading of Wyckoff's ordinance that would grant a monopoly to S&S prohibiting supermarkets on any other lot in the Township.  IS' property is authorized for use by "retail food stores."  DLS Dec., Ex. N at p. 27.  S&S' argument raised before the WPB and the state courts was that when Wyckoff and MA, the owner of the adjacent shopping center, settled a zoning dispute by rezoning only that property, Wyckoff effectuated a surreptitious rezoning of IS' property to prohibit a longstanding use without notice.  DLS Dec., Ex. R at p. 4-5.

S&S' argument was clearly wrong for several reasons.  First, Wyckoff has historically interpreted the retail food store "use to include grocery stores and supermarkets."  DLS Dec., Ex. R at p. 3.  Second, the definition of a "retail food store" includes a supermarket.  DLS Dec., Ex. S.  Third, according to the Township's planners, there was never any thought given to affecting any other properties, aside from the shopping center, to prohibit supermarkets elsewhere in

27

Wyckoff.  DLS Dec., Ex. M-11 at 11-13 to 11-18; M-13 at 47-3 to 47-6).  In zones

where there was a desire to preclude that use, Wyckoff's ordinance permits retail

food stores but expressly prohibit supermarkets.  DLS Dec., Ex. H at p. 8; Ex. N at

p. 21. Wyckoff's Master Plan even calls for opening of a second supermarket

within the Township on IS' property.  DLS Dec., Ex. O, P, Q.  Bryan Hekemian,

MA's principal, testified that *his* planner inserted the term "supermarket" into the

ordinance.  DLS Dec., Ex. M-8 at 26-2 to 26-21.  S&S ignored the actual evidence,

but its interpretation was flatly wrong, and was rejected by every tribunal that

examined it.  The irony of S&S' argument was lost on no one, given that S&S had

developed the existing supermarket on the property.  DLS Dec., Ex. U.

    And S&S' argument that IS needed a use variance because its plans violated

the title and purpose of the B-5 Zone was baseless as well.  Wyckoff's ordinance

states that uses in the B-5 Zone should "serv[e] primarily the residents of...Wyckoff

as distinguished from the surrounding regional area..." DLS Dec., Ex. N at p. 3.  [Pa

564].  But the evidence presented was that the majority of the users of the

development would be Wyckoff residents.  DLS Dec., Ex. M-7 at 11-23 to 15-14;

Ex. T at p. 3.  Also, the legal position – that the WPB could determine if a permitted

use was prohibited based upon where its customer lived – would cause an illegal

decision.  *See, PRB Enterprises, Inc. v. Planning Bd.*, 105 *N.J.* 1, 7 (1987).  S&S

was wrong on the facts and the law.  That is why every agency and court that has reviewed the issue categorically rejected S&S' baseless position.

        ii.    S&S' conflict of interest claims were objectively baseless

S&S' claims during the hearings and on appeal that the WPB's traffic expert had a conflict that could not be cured were legally incorrect. In claiming that its conflict argument succeeded, S&S ignores what it argued to the WPB and in court. S&S *did not* advocate for replacement of the Board's traffic consultant; it insisted that the only recourse was to start the hearings anew – something that would obviously significantly delay IS' development of a competing store.  DLS Dec., Ex. A at p. 48 at ¶5-6.  But the controlling law was clear, and directed the result—replacement of the expert—decided upon here. *Klug* v. *Bridgewater Planning Bd.*, 407 *N.J. Super.* 1 (App. Div. 2009).  On appeal, the Appellate Division conclusively rejected S&S' argument that the hearings were tainted even though the Board replaced the expert before he testified that the approval could not stand. DLS Dec., Ex. H at p. 15-17.  It relied directly on *Klug,* which IS identified as the controlling precedent when the conflict claim was first made before the WPB. DLS Dec., Ex. M-10 at 23-21 to 35-10.  S&S knew when it filed suit that there was no chance its claims could succeed, even if there was a conflict. S&S ignores its litigation position because it is indefensible.  JEJ Dec. ¶ 21.

        iii.    S&S' witnesses' false testimony highlights S&S' motives

S&S cites the Third Circuit's decision in *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147 (3d Cir. 1995), for the proposition that its presentation of the false and misleading testimony to the WPB identified is not actionable.  But *Kirk* addressed whether the out-of-court testimony of an expert hired by a litigant in a separate action could constitute an admission and circumvent the hearsay bar.  *Id.* at 164-165.  Here, S&S' experts and employees testified before the WPB on its behalf and the sham litigation it filed was based upon those proceedings.  *Kirk* is inapposite.

The allegations referenced in Point III.B.3 of S&S' brief do not, in and of themselves, form the basis for S&S' liability.  IS' allegations are "other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on [IS] by [S&S'] petitioning activity" that trigger the sham exception.  *Hanover, supra,* 806 F.3d at 181.  The Complaint alleges that at every step of the process, S&S used tactics designed to interfere with IS' lawful access to the WPB, and later, to state courts in New Jersey. The Court should consider these actions in assessing whether the petitioning activity constitutes a sham.

> iv.    S&S's arguments about a traffic light had no merit

S&S identifies nothing of merit about its objection concerning installation of a traffic light at the intersection of Wyckoff Avenue and Greenwood Avenue.  As S&S notes, IS initially *wanted* to install a traffic light, but ultimately changed its plans.  The WPB deferred to the CPB – over S&S' objections.  The CPB decided,

2639695_15\160089

based upon issues related to the nearby railroad crossing and a complicated

intersection, with numerous properties affected and involved, over which IS had no

control, to study the issue and require IS to pay a portion of the study costs and for

the signal improvements, again over S&S' objection.  S&S argued to the WPB, the

CPB, and the BCF that IS should be prohibited from opening its store until a signal

was operational, never focusing that a traffic light might not be a good idea in the

location.  Each body rejected those claims.  S&S' argument on was about process,

not outcome – it sued to challenge both approvals and argued that failure to require

a traffic light *immediately* was arbitrary, capricious and unreasonable—as if S&S

could force the County to expend taxpayer dollars to build a light it wanted (to

slow down the project).  At every level its claims were rejected.

> v.      S&S's large truck claims were objectively baseless

Under *N.J.S.A.* 39:3-84(a)(4), WB-67 trucks are illegal in New Jersey.  S&S

argues here that IS' plan could not accommodate WB-62 trucks, but ignores the

allegations in its sham litigation that focused *only* on WB-67 trucks.  DLS Dec.,

Ex. A at p. 31 ¶5. The WPB relied upon IS' truck turning template and its own

consultant's opinion, and rejected S&S' expert's opinion concerning WB-62 trucks

DLS Dec., Ex. M-12 at 14-23 to 15-3; Ex. V.   This was well within its right to do,

and S&S' claims on this basis were objectively baseless.  *Shim v. Washington Twp.*

*Planning Bd.,* 298 N.J. Super. 395, 412 (App. Div. 1997)(a reasonable decision to accept or reject testimony of witnesses is not the basis for reversal)

Of course, the site's purported inability to accommodate large trucks could not have possibly altered the outcome; it would have only required a redesign, like in *Hanover,* supra.  It was just another issue S&S used to delay the hearings.  So specious was the claim that the Appellate Division found this issue so lacked merit to even warrant discussion in its opinion.  DLS Dec., Ex. H at p. 17-18.

      vi.    S&S' baseless claim that a shopping center is a residential zone

S&S asked the WPB and the state courts to believe the non-believable – that the 200,000+ square foot, multi-building Boulder Run shopping center, which had 16 apartments, was in a residential zone.  It then had the temerity to request that IS provide a 100-foot setback from its building to the property line to protect those apartments—which are 500 feet away from the common property line, on the second floor of a commercial building, and separated from the property line by S&S' building and a huge parking lot.  It was a spurious argument from the start.  The WPB concluded no variance was required, but granted a variance anyway, even if it was needed.  GVA Dec. at Ex. H at p. 57-58.

S&S claims that its objections before the WPB resulted in a better plan because of additional buffering on the boundary.  This argument highlights the insubstantiality of its claimed success.  *Hanover, supra,* 806 *F.3d* at 182-183.

32

Why else would S&S care how close IS' building was to apartments 500 feet away but for to force a meaningless redesign that delayed the application.  The landscape buffer had nothing to do with S&S' claims vis-à-vis the setback or its challenge to the variance in the state courts.  DLS Dec., Ex. G at p. 12.  Even if S&S was right about the residential zone issue, there was no merit to its claim because the Board acted in the alternative by exercising its discretion to grant the variance; S&S had no chance of winning this argument.  JEJ Dec. ¶19.

>          vii.     S&S' other insubstantial participation during the WPB hearing

S&S highlights the purported benefits of its objections in Point III.B.7 of its brief.  Those items are of the same ilk identified by in *Hanover, supra,* as being insubstantial.  *Id.*  S&S' goal was not to cause more parking to be added to the site plan or correct a deed overlap – it was trying to derail and delay the proceedings before the WPB.  It did that.  Equally important is that none of the issues identified in Point III.B.7 were even mentioned in S&S' legal challenge in the state courts – these issues simply have nothing to do with the matter in question.

>          viii.    Conclusion

S&S is 0-for-7 in litigation, including the three administrative agencies  that rejected its positions. When counting the myriad of appeals, S&S and MA, whom it encouraged, were 0-for-11.  As detailed in the FAC, it unnecessarily delayed the process to thwart IS's project.  Under *Hanover*, *supra,* its conduct was a sham

33

because it presented objectively baseless arguments.  Coupled with its improper conduct, *Hanover* deprives S&S of *Noerr-Pennington* immunity.

Even if the Court determines that S&S' multiple lawsuits—which challenged <u>every</u> municipal and county decision made involving IS' development—do not constitute a "series," the FAC properly states a claim.  As detailed above, S&S' arguments were objectively baseless.  No reasonable litigant could have believed there was a chance to succeed.  S&S does not even contest its motives under the second prong of the test in *PRE, supra*.  Even if the Court uses the *PRE* standard, it should not find that S&S' conduct is immunized under the *Noerr Pennington* doctrine because its claims were objectively baseless.

## IV.   THE FAC STATES A CLAIM FOR CONCERTED ACTION

S&S' reliance on *Burtch v. Milberg Factors, Inc.* 663 F.3d 212 (3d Cir. 2011), is misplaced.  The plaintiff there alleged a series of phone calls where certain information was exchanged but no evidence of an agreement.  *Id.* at 225.  By contrast, the FAC alleges that MA admitted to IS that S&S had coerced a reluctant MA to object, otherwise, S&S would inflict harm on MA economically.  FAC ¶ 71-73; *see also* SH Dec. at ¶ 4-5.  That conversation, which explicitly manifested the existence of an agreement, alleges direct evidence of the conspiracy alleged in Count 1 and 3 of the FAC.  *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 324 n.23 (3d Cir. 2010).  It then alleges that MA and S&S objected at the

34

WPB jointly, for a time, through a single attorney (which is obviously not parallel conduct), in an effort to delay and impede IS' proposed store and thereby harm competition.  FAC ¶ 75, 81; DLS Dec., Ex. M-1 at 5-11 to 5-14.  It alleges that S&S and MA shared experts.  FAC ¶ 248.  It alleges that they coordinated objections during the hearing to harm IS.  FAC ¶ 83.c; DLS Dec., Ex. M-9 at 99-14 to 99-15.  S&S and MA even collaborated on a joint appendix in *separate appeals* of the WPB decision.  FAC ¶ 192, 200.  DLS Dec., Ex. LL.  These facts, when proven, will show that S&S and MA worked together, not that they were acting independently, and further that it is plausible that S&S and MA entered into an agreement to block IS' project for the purposes of stifling competition and preserving S&S' dominant market position in Greater Wyckoff.  *Twombly, supra,* 550 U.S. at 554, 556.

The discovery process will reveal the name of the person who made the demand on MA and when it occurred.  *West Penn Allegheny Health System, Inc. v. UPMC,* 627 F.3d 85, 98 (3d Cir.2010).  The allegations in the FAC are not simply conclusions or restatements of the elements of the claim.  *Iqbal, supra,* 556 U.S. at 678.  The Court must assume that the above allegations of facts are true, and decide whether the allegation that MA admitted that it had agreed with S&S to work together to stop IS' project and then collaborated in furtherance of that goal suggests an agreement.  *Id.*  We think it does.

35

S&S is also wrong to rely on *Gordon, supra*.  There, the Third Circuit held that an antitrust plaintiff relying only on circumstantial evidence and inferences drawn from that evidence may avoid *summary judgment* if that the evidence excludes the possibility of independent action.  423 F.3d at 208.  Here, IS is relying on direct proof and not just circumstantial evidence.  FAC ¶ 71; SH Dec. at ¶ 4-5.

The FAC pleads enough facts to permit the inference of an agreement.

## V.   IS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED BECAUSE THIS CASE AND S&S' LAWSUITS ARISE FROM DIFFERENT CORE FACTS AND THE POLICIES UNDERLYING THE ENTIRE CONTROVERSY DOCTRINE MILITATE AGAINST ITS APPLICATION

IS' State-law Claims ("SLCs") are not barred by the Entire Controversy Doctrine ("ECD"), despite S&S' argument that IS' claims were compulsory counterclaims in S&S' sham litigations.  S&S ignores that IS' claims in Counts 3, 4, 5, 6 and 7 of the FAC do not concern the same core facts as S&S' challenges to the decisions of the WPB, CPB, and BCF.  The claims raised here sound in tort and antitrust, and turn on whether, and to what extent, S&S' bad acts injured IS.  S&S' state court actions were actions in lieu of prerogative writs – narrow proceedings aimed at reviewing actions taken by government.  *Selobyt v. Keough-Dwyer Corr. Fac.,* 375 N.J. Super. 91, 96 (App. Div. 2005).  Also, the policies underlying the ECD would not be furthered by its application here.  Those policy considerations militate against the doctrine's application.

36

The ECD only requires joinder of actions that arise from the same core facts. *DiTrolio v. Antiles*, 142 N.J. 253, 272 (1995).  Absent that factual nexus, joinder is not required.  *See Waste Management of Penn., Inc. v. Shinn*, 938 F.Supp. 1243, 1257-58 (D.N.J. 1996)(holding that the ECD did not bar tort claims where a state court previously reviewed whether agency decision was arbitrary and capricious).

Further, under ECD jurisprudence, prerogative writs actions – like those at issue here – are different animals.  *See e.g., Garvey v. Township of Wall*, 303 N.J. Super. 93 (App. Div. 1997).  *Joel v. Morrocco*, 147 N.J. 546 (1997), is instructive. There, the plaintiff brought an action in lieu of prerogative writs challenging zoning approvals issued to a partnership.  After exacting a settlement from the partnership, the same plaintiff sued the individual partners to enforce the settlement.  The Court held that the ECD did not bar the later action because the first claim was tried on the basis of the hearing record, while the personal claims were unnecessary to deciding the initial action.  *Id.* at 550.

Like *Joel,* none of the facts necessary to resolve IS' state law claims were established in the WPB or CPB hearings, or the subsequent litigation.  The record of the proceedings was limited to the administrated record.  *Willoughby v. Planning Bd.,* 306 N.J.Super. 266, 273 (App. Div. 1997).  IS' tort claims in the FAC, on the other hand, arise from improper use of the judicial process as an anti-competitive weapon.  They are not barred.

37

Even if S&S' sham lawsuits and this suit concern the same core facts, the policy considerations underlying the ECD do not support its application. New Jersey law is clear that unless the policies underlying the ECD are furthered, it should not be applied. *Garvey, supra.* They are: (1) complete disposition and avoidance of piecemeal decisions; (2) fairness to parties; and (3) efficiency and the avoidance of waste and the reduction of delay. *DiTrolio, supra*, 142 N.J. at 267.

First, IS' decision to bring the SLCs facilitates the complete and final disposition of those claims. S&S, argues that the SLCs should have been decided in the multiple litigations in the New Jersey courts, and that IS should have counterclaimed when the first action was filed in April of 2013. But IS obviously could not assert claims based upon S&S' subsequent sham suits against the CPB and BCF in defending the WPB approval. This nonsensical approach would yield the very result that the ECD avoids: piecemeal litigation. Resolution of these claims here, in one action, is the *only* way to avoid "piecemeal" resolution.

Second, it would be unfair to bar IS from bringing its SLCs here. The ECD's polestar is fairness to the parties and to the system of judicial administration. *K-Land Corp. No. 28 v. Landis Sewerage Authority*, 173 N.J. 59, 73-74 (2002). In determining fairness, consideration of whether the party had a fair opportunity to adjudicate the claim in the first action is necessary. *Karpovich v. Barbarula*, 150 N.J. 473, 481 (1997). Requiring IS to assert the SLCs as

38

compulsory counterclaims in a prerogative writs action imposes an unfair, if not impossible, choice. Electing to do so would require sacrificing the special procedural nature and "fast track" nature of prerogative writs cases – something that benefitted only S&S – otherwise, IS would be forced to abandon its tort claims. This creates a patently unfair "catch-22" that the ECD does not require.

Finally, the third policy consideration – namely, efficiency and reduction of delay – militates against the SLCs being compulsory counterclaims. Raising the SLCs in the New Jersey courts would have drastically impaired the efficiency of those proceedings. Prerogative writ actions are designed for speedy resolution. Such actions must be brought within 45 days of the challenged administrative decision and are individually case managed within 30 days of joinder. *See* N.J. Court *R.* 4:69. Challenges to planning board decisions involve no discovery; they are summary actions relying on records developed below. *Hirth v. Hoboken,* 337 N.J. Super. 147, 166 (App. Div. 2001). These features all facilitate the fundamental purpose of prerogative writ actions: to allow speedy judicial review of municipal decisions. *See Reilly v. Brice*, 109 N.J. 555, 559 (1990). Requiring a defendant in a prerogative writs action to assert civil tort and state antitrust counterclaims (without the ability to seek relief under the Sherman Act) in those proceedings entirely defeats the purpose. Such counterclaims raise countless ancillary fact issues and graft discovery onto a process designed for speed.

39

This case is a prime example.  IS sought and received local approval to open a new supermarket in 2010, which S&S delayed until 2013.  By comparison, the WPB approved S&S' store in in five days.  FAC ¶ 64.  S&S then challenged the approvals, which were streamlined proceedings designed to avoid the delays of general civil litigation.  The case went to trial less than ten months after S&S filed its Complaint.  The challenge to the CPB approval was similarly expeditious.  The proceedings furthered important public policies – efficient resolution of disputes involving government.  Had IS asserted tort and antitrust counterclaims, it would have prolonged the cases.  The resultant delay across numerous litigations would have hampered, rather than furthered, the efficient administration of justice.  S&S' entire-controversy-doctrine argument fails, and should be rejected by this Court.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant The Stop & Shop Supermarket Company, LLC's motion to dismiss for failure to state a claim.

BEATTIE PADOVANO, LLC
Attorneys for Plaintiff,
Inserra Supermarkets, Inc.

By:  /s/ Arthur N. Chagaris
   Arthur N. Chagaris, Esq. (AC-4713)
   A member of the firm

September 30, 2016

40

2639695_15\160089